United States District Court
Southern District of Texas
**ENTERED**
March 12, 2021
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JUAN JOSE ARELLANO-VELAZQUEZ, (TDCJ-CID #02091454) | § § § § | |
| Petitioner, | § § | |
| VS. | § § | CIVIL ACTION NO. H-19-4448 |
| LORIE DAVIS, | § § § | |
| Respondent. | § | |

## MEMORANDUM AND OPINION

Petitioner Juan Jose Arellano-Velazquez ("Arellano") seeks habeas corpus relief under 28 U.S.C. § 2254, from a conviction entered against him in the 208th Judicial District Court of Harris County, Texas. Respondent filed a motion for summary judgment, (Docket Entry No. 7), and copies of the state court record. Arellano has filed his response. (Docket Entry No. 9).

## I.    Background

A jury found Arellano guilty of the felony offense of possessing, with intent to deliver, a controlled substance, namely cocaine, weighing at least 400 grams. (Cause Number 147933301010). On September 22, 2016, the jury sentenced Arellano to sixty years' imprisonment. The First Court of Appeals for the State of Texas affirmed Arellano's conviction in an unpublished opinion. *See Arellano-Velazquez v. State*, No. 01-16-789-CR, 2018 WL 454796 (Tex. App.–Houston [1st Dist.] Jan. 18, 2018, pet. ref'd). The Texas Court of Criminal Appeals refused Arellano's petition for discretionary review on June 6, 2018. Arellano filed an application for state

habeas corpus relief on March 25, 2019, which the Texas Court of Criminal Appeals summarily denied without written order on October 16, 2019. (Docket Entry No. 8-20, *Ex parte Arellano-Velazquez,* Writ No. 90,328-01, p. 1).

On November 7, 2019, this Court received Arellano's federal petition for relief under 28 U.S.C. § 2254. Arellano contends that his conviction is void for the following reasons:

1. He was denied meaningful review of his state court habeas petition because:

  (a) the trial court "refused to answer" and denied his motion seeking a 90-day loan of his trial transcripts for use in his state habeas proceeding;

  (b) the First Court of Appeals denied his petition for mandamus which sought to compel the trial court to grant his motion for a loan of his trial transcripts for use in his state habeas proceeding;

  (c) neither the trial court nor the Texas Court of Criminal Appeals obtained an affidavit from his trial counsel in response to his state habeas petition; and

  (d) neither the trial court nor the Texas Court of Criminal Appeals made findings of fact or conclusions of law concerning the claims raised in his state court habeas petition.

2. Trial counsel, Robert Valles, rendered ineffective assistance by failing to object to a biased prospective juror who was subsequently empaneled;

3. The State "committed prosecutorial misconduct" by failing to disclose that two accomplice-witnesses received reduced sentences in exchange for their testimony; and

4. Trial counsel, Robert Valles, rendered ineffective assistance by failing to properly object to evidence of "unadjudicated extraneous acts" that was inadmissible under Texas Rules of Evidence 403 and 404(b);

5. His conviction is invalid because there was "no corroboration of the evidence" from the accomplice-witnesses.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 6-7).  The respondent argues that grounds 1(a), (b), (c), and (d) are not cognizable in a federal habeas petition and that grounds 2, 3, 4, and 5 lack merit.

## II.    The Applicable Legal Standards

This Court reviews Arellano's petition for writ of habeas corpus under the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997) (citing *Lindh v. Murphy*, 521 U.S. 320, 336 (1997)).

Sections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an adjudication on the merits. An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000). Under section 2254(d)(1), a state court's determination of questions of law and mixed questions of law and fact receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(1)).  A state court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 529 U.S. 362, 405 (2000).  A state court unreasonably applies Supreme Court precedent if it identifies the correct legal rule but unreasonably applies it to the facts of a particular case or "unreasonably extends a legal principle from [Supreme Court] precedent to

3

a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. Factual findings made by the state court are "presumed to be correct . . . and [receive] deference . . . unless [a finding] 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

Under section 2254(e)(1), a state court's factual findings are entitled to deference and are presumed correct unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (quoting *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005)). This deference extends not only to express findings of fact, but also to any implicit findings of the state court. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005), and *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

This deferential AEDPA standard of review is not altered when state habeas relief is denied without a written opinion because a federal habeas court reviews only the reasonableness of the state court's ultimate decision. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us that a federal habeas court is authorized by [§] 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001). In the absence of a written state court opinion, this court (1) assumes the state court applied the proper "clearly established Federal law"; and (2) determines whether the state court's decision was "contrary to" or "an objectively unreasonable application of" that law. *Catalan v. Cockrell*, 315 F.3d 491, 493 & n.3 (5th Cir. 2002); *see also Robertson v. Cain*, 324 F.3d 297, 303 (5th Cir. 2003) (assuming the state court was aware of relevant Supreme Court decisions even though they were not cited in its opinion). In conducting its review when "there is no reasoned

4

state-court decision on the merits, the federal court 'must determine what arguments or theories .

. . could have supported the state court's decision; and then it must ask whether it is possible [that]

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding

in a prior decision of this Court.'" *Sexton v. Beaudreaux*, — U.S. —, 138 S. Ct. 2555, 2558 (2018)

(quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). "If such disagreement is possible, then

the petitioner's claim must be denied." *Id.* Thus, the habeas petitioner must still meet his or her

burden to show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562

U.S. at 98.

Arellano is proceeding pro se. A pro se habeas petition is construed liberally and not held

to the same stringent and rigorous standards as pleadings filed by lawyers. *See Hernandez v. Thaler*,

630 F.3d 420, 426 (5th Cir. 2011); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988). This

Court broadly interprets Arellano's state and federal habeas petitions. *Bledsue v. Johnson*, 188 F.3d

250, 255 (5th Cir. 1999).

## III. Statement of Facts

When affirming Arellano's conviction on direct appeal, the First Court of Appeals

summarized the evidence at trial as follows:

> ### The police surveil Arellano, observe him pick up narcotics, and arrest him and his accomplices
>
> One morning, Officer M. Zamora of the Houston Police Department was surveilling a Honda parked in front of a house in east Houston. The house was the residence of Juan Arellano-Velasquez, whom Zamora had been investigating for suspected drug trafficking. Zamora had received a tip from a confidential informant that the Honda would soon be leaving town with an undetermined amount of narcotics. He observed that the Honda had a broken window and then left the scene in his unmarked vehicle.

When Officer Zamora returned to the residence later in the day, he observed that the window had been repaired, leading him to suspect some movement was about to occur. He then observed Arellano exit his house, get into the Honda, and drive away. He called Officers G. Haselberger and K. Venables to provide rolling surveillance.

Communicating through a back-channel police radio, the officers followed the Honda to a shopping center, where they observed Arellano pick up a man, later identified as Omar Hernandez. The officers continued to follow the Honda as it left the shopping center and drove to a washateria.

Surveilling the washateria from across the street, Zamora observed the Honda park next to a Toyota, which was driven by a man later identified as Edgar Henriquez. He then observed an Infiniti pull up and park beside the Honda. Zamora continued to watch as Hernandez got out of the Honda, retrieved a backpack from a passenger in the Infiniti, put the backpack in the backseat of the Toyota, and then got back into the Honda.

After the exchange, the Honda and Toyota left the washateria and drove "in tandem" to a convenience store, where the officers stopped and detained Arellano, Hernandez, and Henriquez. Officer Haselberger asked Henriquez whether there were drugs in the Toyota, and he responded, "Yes. In the black bag."

The officers then searched the Toyota, retrieved the backpack from the backseat, and found six bricks of cocaine inside.   Zamora testified that the cocaine was worth approximately $600,000 and that the amount was consistent with distribution, not personal use.

The officers also seized multiple cell phones from the three men (two from Arellano, one from Henriquez, and three from Hernandez). Zamora testified that finding multiple phones on an individual is consistent with narcotics trafficking, as it is common for drug dealers to use multiple phones to create a buffer between dealers, couriers, and customers.

The records of the calls from those phones were retrieved by other officers pursuant to a search warrant. The records showed that, in the days leading up to the offense, Arellano and Hernandez exchanged 36 phones calls. Zamora testified that the high number of calls indicated that they were planning something.

*Arellano is indicted, tried, and convicted*

Arellano was indicted for possession with intent to a deliver over 400 grams of cocaine. At trial, Henriquez and Hernandez testified as witnesses for the State.

Henriquez testified that Arellano was the "boss" of the operation and Hernandez was the "go-between." According to Henriquez, Arellano told Hernandez what to do, and Hernandez, in turn, told Henriquez where to go. Henriquez further testified that, while in the holding cell after the arrest, Arellano offered to pay him $100,000 if he took the blame, but he refused.

Hernandez's testimony was more detailed. Hernandez testified that, on the day of the arrest, Arellano called him in the morning and instructed him on what to do and that, once they were detained by the police, Arellano told him, "It's over."

Hernandez further testified to several instances in the months leading up to the arrest in which he and Henriquez picked up or delivered narcotics at Arellano's behest. Hernandez claimed that he did not want to continue working for Arellano but felt like he had to in order to pay a debt for a shipment of drugs that had been stolen. Hernandez testified that he was afraid that if he quit before paying the debt, Arellano would kill him or his mother. Hernandez testified that Arellano had once threatened to cut his friend's head off because Arellano believed his friend had stolen a shipment of drugs from him.

A jury found Arellano guilty and assessed punishment at 60 years' confinement and a $250,000 fine. The trial court sentenced Arellano in accordance with the jury's verdict. . . .

*Arellano-Velazquez v. State,* No. 01-16-00789-CR, 2018 WL 454796, at *1-2 (Tex. App. -- Houston [1st Dist.] Jan. 18, 2018, pet. ref'd) (mem. op., not designated for publication).

## IV. The Claim of Prosecutorial Misconduct Based on Failure to Disclose Favorable Evidence (Ground 3)

Arellano complains that the prosecutor failed to disclose favorable evidence to the defense prior to trial. He alleges that the prosecutor failed to disclose that the two accomplice-witnesses, Hernandez and Henriquez, received reduced sentences in exchange for testifying against Arellano.

7

(Docket Entry No. 1, p. 7).  Arellano contends that the prosecutor gave these accomplice-witnesses "deals" to testify in exchange for extremely low sentences.  (Docket Entry No. 1, p. 7).  Arellano also contends that by failing to disclose information about these "deals," the prosecutor prevented Arellano from impeaching these witnesses.

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  This duty to disclose favorable evidence applies even when there has been no request by the accused.  *See Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976).  The duty to disclose applies to both exculpatory and impeachment evidence.  *See Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Undisclosed evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995); *Bagley*, 473 U.S. at 682.  A reasonable probability of a different result exists when the undisclosed evidence puts the case in a different light so as to undermine confidence in the jury's verdict.  *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).  The critical question is "whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different."  *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999).

In his *Brady* claim, Arellano asserts that the prosecutor failed to disclose that the state had offered accomplice-witnesses Hernandez and Henriquez sentencing "deals" in exchange for their

testimony against Arellano. Arellano argues that the evidence was material because it would have impeached the testimony of Hernandez and Henriquez, placing their testimony in a different light that would render it less credible. Arellano insists that the prosecutor had a duty to disclose this exculpatory impeachment evidence and that the failure to do so violated his right to due process.

In reviewing the state habeas court's denial of this ground, this Court assumes that the state habeas court applied *Brady* when considering Arellano's claim. *See Catalan*, 315 F.3d at 493. This Court must then consider whether the state habeas court's decision to deny relief was "contrary to" or "an objectively unreasonable application of" *Brady*. *Id.*

The record reflects that the State filed a "Notice of Intent to use Accomplice Witness Testimony" before trial, stating that both Hernandez and Henriquez had entered guilty pleas "without an agreement on the punishment to be assessed by the Court." (Docket Entry No. 8-13, p. 45). During trial, Officer Zamora of the Houston Police Department testified that at the time of trial, both Hernandez and Henriquez had entered guilty pleas and were awaiting sentencing. (Docket Entry No. 8-16, p. 114). Officer Zamora testified that both Hernandez and Henriquez cooperated with him after their arrests, but Officer Zamora made no promises or guarantees to either of them about what their sentences might be. (Docket Entry No. 8-16, p. 114).

Edgar Henriquez testified that he had not received any promises from the prosecutor concerning his sentence:

> Q. [Ms. Russell]: Have you and I talked about this case before?
> A. [Mr. Henriquez]: Uh-huh.
> Q. And one time or a couple of times?
> A. One -- couple of times.
> Q. Couple of times, okay. Have I ever offered you or promised you anything in exchange for your testimony?
> A. No.

9

> Q.  Has anybody else offered you or promised you anything in exchange for your testimony?
> A.  No.
> Q.  What is the one thing that I have told you over and over is the one big rule about testifying?
> A.  You need to tell the truth and nothing but the truth.
> Q.  Is that what you intend to do here today?
> A.  Yes, ma'am.

(Docket Entry No. 8-16, pp. 169-70).  Later in his testimony, Henriquez reiterated that no one had promised him "anything in exchange for coming and talking here today." (Docket Entry No. 8-16, p. 210).

Omar Hernandez also testified that he had not been promised a reduced sentence in exchange for his testimony:

> Q.  [Ms. Russell]:  What is the status of your case that you were charged with on August 24th, 2015?
> A.  [Hernandez]:  I was charged with possession of a controlled substance with intent to deliver over 400 grams.
> Q.  And is that case still pending or have you pled out on that case?
> A.  The case is still open.  It's pending.
> Q.  Have you ever entered a plea of guilty or not guilty to that offense?
> A.  Yes, ma'am.  I have pleaded guilty for my cooperation.
> Q.  You just said something about your cooperation.  Why are you here testifying today?
> A.  I'm here testifying because I want the whole truth to be known how it happened, how I'm guilty or how Edgar Henriquez is involved, but also how Arellano is guilty.
> Q.  Have I promised you anything in exchange for your testimony here today?
> A.  No, ma'am, never.
> Q.  Have any other -- has a police officer testified -- has a police officer promised you anything in exchange for your testimony?
> A.  No, ma'am, no police officer, nobody, no lawyers, nothing.
> Q.  Has anyone offered you anything in exchange for your testimony here today?
> A.  No, ma'am, no one has offered me anything for my testimony.

10

(Docket Entry No. 8-17, pp. 14-15). Later in his testimony, Hernandez reiterated that he had not been promised or guaranteed any benefit because of testifying or cooperating with the state. (Docket Entry No. 8-17, p. 132). Further, on cross-examination, defense counsel elicited testimony from Hernandez that he had not yet been sentenced at the time of trial and that he had not been promised anything about what his sentence might be. (Docket Entry No. 8-17, pp. 148-50).

Given this trial testimony, the state habeas court's decision to deny relief on this claim was neither contrary to *Brady* nor an objectively unreasonable application of *Brady* to the facts of the case. Arellano identifies no evidence, other than the length of the sentences later imposed, to support his claim that Hernandez and Henriquez received "deals" from the state in exchange for their testimony. He cannot show that the prosecutor withheld favorable impeachment evidence of sentencing "deals" because he fails to show any such evidence existed. And "[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value." *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) (citation omitted).

Nothing in he record shows that *Brady* was violated. *See Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (finding no *Brady* violation when the evidence that was withheld was not favorable to either the defendant or his exculpatory theories). Arellano has not shown that the prosecutor failed to disclose favorable evidence or that the state habeas court's decision denying relief was an objectively unreasonable application of *Brady* to the facts of his case. Arellano is therefore not entitled to federal habeas corpus relief on this claim.

11

## V.    The Claims of Ineffective Assistance of Trial Counsel (Grounds 2 and 4)

Arellano contends that he was denied effective assistance of counsel in violation of the Sixth Amendment at his trial, where he was represented by Robert Valles.  The Court reviews Sixth Amendment claims concerning the alleged ineffective assistance of counsel, whether at trial or on direct appeal, under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a habeas petitioner must demonstrate that his attorney's performance fell below an objective standard of reasonableness.  *Id.* at 687-88.  To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687; *see also Buck v. Davis*, 580 U.S. —, 137 S. Ct. 759, 775 (2017) (reaffirming that "[i]t is only when the lawyer's errors were 'so serious that counsel was not functioning as the "counsel" guaranteed . . . by the Sixth Amendment' that *Strickland*'s first prong is satisfied") (citation omitted).  "[B]ecause of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003) (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)).  "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are required not

simply to give [the] attorney's [sic] the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (internal quotation marks omitted) (quoting *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1407 (2011)). Therefore, "[o]n habeas review, if there is any 'reasonable argument that counsel satisfied *Strickland*'s deferential standard,' the state court's denial must be upheld.." *Rhoades v. Davis*, 852 F.3d 422, 432 (5th Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

In addition to deficient performance, the habeas petitioner alleging ineffective assistance of counsel also must prove that he was prejudiced by his attorney's substandard performance. *See Strickland*, 466 U.S. at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To demonstrate prejudice, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

13

## A.      Ground 2: Failure to Object to Biased Prospective Juror

In his first ineffective assistance of counsel claim, Arellano argues that Valles provided ineffective assistance by failing to object to a biased prospective juror who was subsequently empaneled.  Arellano alleges that the prospective juror expressed bias against Arellano by stating during voir dire that "a finding of not guilt [sic] was not possible."  (Docket Entry No. 1, p. 6).  In response to the respondent's motion for summary judgment, Arellano identified the biased juror as "venire number 4," who stated that Arellano "must testify to show his innocence."  (Docket Entry No. 9, p. 4).

In his state habeas petition, Arellano alleged only that Valles was ineffective because he "failed to object to a venire members [sic] who was impaneled that expressed biasness [sic] of not being able to find [Arellano] innocent."  (Docket Entry No. 8-21, p. 12).  Arellano neither identified the juror in any manner nor identified the nature of the juror's bias.

Section 2254(b)(1)(A) of AEDPA requires a state prisoner to exhaust the remedies available in state court before relief sought in a federal habeas petition can be granted.  To exhaust state remedies, a habeas petitioner must have fairly presented the substance of his federal constitutional claims to the state courts.  *See Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).  This requires that any federal constitutional claim presented to the state court be supported by the same factual allegations and legal theories upon which the petitioner bases his federal claims.  *See Picard v. Connor*, 404 U.S. 270, 276 (1971).  "Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies."  *Id.*

14

Further, courts are not required "to scour the record for factual issues that might support a pro se litigant's position; it is that litigant's obligation to direct the court's attention to the relevant evidence." *Perez v. Johnson*, 122 F.3d 1067, 1997 WL 464599, at *1 (5th Cir. July 31, 1997) (citing *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994) (*pro se* appellant must identify in his brief the specific portions of the record that contain the facts or issues that warrant appellate relief)); *see also Lively v. Director*, TDCJ–CID, 2014 WL 4404512, at *11 (E.D. Tex. Sept. 4, 2014) (same).

Arellano's state habeas petition contained no facts that would point the state habeas court to any federal constitutional violation. The state habeas court was not required to scour the trial transcript in an effort to identify which juror might have expressed some bias that would have prevented him or her from finding Arellano not guilty. And while Arellano has provided additional facts in his federal habeas petition, as well as in his response to the respondent's motion for summary judgment, those additional facts do not bear on the question of whether the state habeas court's denial of relief on this ground was objectively unreasonable. Having failed to exhaust his state remedies on this ground, Arellano is not entitled to federal habeas relief.

Further, even if this Court considered the additional allegations contained in Arellano's federal habeas petition, he has not carried his burden of proof. A federal habeas court must initially presume that the jury was impartial. *See De La Rosa v. Texas*, 743 F.2d 299, 306 (5th Cir. 1984) (citation omitted); *United States v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir. 1983). A juror is not impartial if he or she harbors an actual bias such that his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). "On federal habeas corpus review, proof of actual bias requires a showing that the jurors

15

in a given case had 'such fixed opinions that they could not judge impartially the guilt of the defendant.'" *Caldwell v. Thaler*, 770 F. Supp. 2d 849, 868 (S.D. Tex. 2011) (quoting *Chavez v. Cockrell*, 310 F.3d 805, 811 (5th Cir. 2002)). To demonstrate actual bias, a federal habeas petitioner must point to an "admission" or present "factual proof" of bias on the juror's part. *United States v. Thomas*, 627 F.3d 146, 161 (5th Cir. 2010) (citing *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001)). In determining whether a prospective juror exhibited actual bias, this Court must consider the juror's answer in context with the initial question asked as well as with any subsequent modifications. *See Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006).

The transcript of Arellano's trial shows that the trial judge asked the entire venire early in voir dire whether there was "[a]nyone who would require that the defendant prove that -- the flip side of that, as I said, which is the case in some countries, that the person on trial prove that they're not guilty?" (Docket Entry No. 8-15, pp. 17-18). There were no affirmative responses. (*Id.*). The trial judge then asked the entire venire whether anyone would "hold it against the person if they elect not to testify." (Docket Entry No. 8-15, p. 19). Prospective jurors numbers 17, 21, 25, and 59 each indicated that they would consider the failure to testify as evidence of guilt. (Docket Entry No. 8-15, pp. 19-24). None of those prospective jurors were selected to serve on Arellano's jury. (Docket Entry No. 8-15, p. 146).

Trial counsel Valles also discussed with the prospective jurors whether they could follow the court's instructions if Arellano elected not to testify. (Docket Entry No. 8-15, pp. 98-106). Prospective juror number 25 again responded affirmatively, stating:

> As I said earlier, I just feel like in the back of my mind I would always be like what was he trying not to say that would possibly like -- like prove that he's not guilty by pleading the Fifth and not giving up that information.

(Docket Entry No. 8-15, p. 99).  However, prospective juror number 25 was not selected to serve on Arellano's jury.  (Docket Entry No. 8-15, p. 146)

Two other prospective jurors also expressed concerns about their ability to follow the court's instruction with respect to a defendant's right to choose not to testify.  (Docket Entry No. 8-15, pp. 100-03, 104-06).  Neither prospective juror who spoke was identified by name or juror number, but both were identified as being seated in the fourth row of the venire.  (Docket Entry No. 8-15, p. 100).  However, the only juror selected from the fourth row of the venire was the alternate juror, who did not participate in the jury's deliberations.  (Docket Entry Nos. 8-16, p. 146; 8-17, p. 203).

The trial transcript does not contain either an "admission" or "factual proof" of actual bias on the part of any prospective juror who was selected to serve on the jury that tried Arellano.  In light of this absence of evidence, this Court finds that the state habeas court's decision to deny relief on this claim does not constitute an unreasonable application of *Strickland* to the facts of this case.

In his response to the respondent's motion for summary judgment in this federal habeas proceeding, Arellano alleges for the first time that the biased juror was prospective juror number 4. Prospective juror number 4 responded verbally only twice during voir dire.  First, when discussing the law of parties, the prosecutor said,

> On a scale of one to four, I want everyone to pick a number of how they feel about this statement:  Accomplice witness testimony is reliable, meaning it's truthful, it's credible, you think it's good evidence that we should be using.  If you agree, strongly agree with that statement, you would pick a one.  If you agree, but not strongly, a two.  If you disagree with that statement, meaning accomplice witness testimony, not good stuff, we shouldn't use it, pick three. And then strongly disagree is a four.  Strongly disagree, meaning I don't want to hear it.  It's bad stuff.  We should never ever even entertain it.

(Docket Entry No. 8-15, pp. 62-63). When asked, prospective juror number 4 responded that he would select option two, thus indicating that he agreed, but not strongly, that accomplice witness testimony was reliable. (Docket Entry No. 8-15, p. 64). Second, in response to Valles's question concerning whether each prospective juror would give more credence to a witness with a "title" rather than one without, prospective juror number 4 responded, "No." (Docket Entry No. 8-15, p. 112).

Even having belatedly identified prospective juror number 4 as the biased juror, Arellano does not point to, and the transcript does not reflect, any "admission" to or "factual proof" of bias on the part of that juror. Thus, Arellano has not shown that prospective juror number 4 had "'such fixed opinions that [he] could not judge impartially'" his guilt. *Caldwell*, 770 F. Supp. 2d at 867–68 (quoting *Chavez*, 310 F.3d at 811). Because he failed to carry his burden to prove that the state habeas court's denial of relief was objectively unreasonable, Arellano is not entitled to federal habeas relief on this ground.

### B.     Ground 4: Failure to Object to Extraneous Acts

In his second ineffective assistance of counsel claim, Arellano argues that Valles provided ineffective assistance by failing to properly object to testimony about extraneous acts presented by the state. Arellano alleges that the testimony concerning these acts should have been excluded under rules 404(b) and 403 of the Texas Rules of Evidence. Arellano raised this claim in the direct appeal of his conviction and sentence. (Docket Entry No. 8-6, pp. 37-41). The First Court of Appeals denied relief, concluding that the objection had not been preserved for review. *Arellano-Velazquez v. State*, No. 01-16-789-CR, 2018 WL 454796, at *4 (Tex. App.–Houston [1st Dist.] 2018, pet. ref'd) (mem. op., not designated for publication). Arellano raised the issue again in his state habeas

18

petition. (Docket Entry No. 8-21, p. 16-17). Arellano has exhausted his state remedies as to this claim, and this Court will consider it on the merits.

Texas Rule of Evidence 404(b), like Federal Rule of Evidence 404(b), prohibits the use of evidence of a crime, wrong, or act, other than the charged act, to prove that the defendant had the propensity to commit the charged act. While not admissible to prove propensity, such evidence may be admissible for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b). Even when such "extraneous act" evidence is admissible, however, it may still be excluded under Texas Rule of Evidence 403, which permits the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, unfair prejudice. Tex. R. Evid. 403.

In this case, the record shows that the prosecutor filed a "Notice of Intention to Use Evidence of Prior Convictions and Extraneous Offenses" prior to trial. (Docket Entry No. 8-13, pp. 25-27). In response, Valles filed two motions in limine directed to the evidence of prior convictions and extraneous offenses. (Docket Entry No. 8-13, pp. 67-70, 74-76). In the first motion, Valles argued the following:

### B. EXTRANEOUS OFFENSES

1. Defendant further requests that the Court enter an order instructing the State, its agents, its employees and its witnesses not to mention, allude to or refer to, in any manner, any extraneous offenses by JUAN JOSE ARELLANO-VELAZQUEZ in this cause in the presence of the jury.
2. Prior to specific mention of extraneous offenses, a hearing should be immediately held outside the presence of the jury for determination of:
   a. the purpose for which the extraneous offense or alleged misconduct is offered;
   b. in what manner the extraneous offense or bad conduct is relevant in establishing the point for which it is offered;

19

      c.  whether it can be shown beyond a reasonable doubt that JUAN JOSE ARELLANO-VELAZQUEZ committed the alleged conduct;

      d.  whether the conduct in question is too remote;

      e.  whether the conduct is offered to prove a disputed issue or clarify an ambiguous act of JUAN JOSE ARELLANO-VELAZQUEZ;

      f.  whether the probative value of the evidence is outweighed by the danger of unfair prejudice and confusion of the issue;

      g.  whether the point for which the conduct is offered can be established in some other fashion without the emotional prejudice inherent in the admission of other offenses.

(Docket Entry No. 8-13, pp. 68-69). The motion requested that the prosecutor not mention or allude to any prior offenses "until a hearing has been held outside the presence of the jury and prior to the Court's determination of relevancy as specified in this motion." (Docket Entry No. 8-13, p. 69).

    Valles's second motion in limine argued the following:

      JUAN JOSE ARELLANO-VELAZQUEZ moves to exclude all extraneous crime or misconduct evidence, which is not alleged in the indictment, unless it can be shown by sufficient proof that Defendant perpetrated such conduct, that this evidence is relevant to a material issue in the case, other than character conformity, and that its probative value outweighs its potential for prejudice.

(Docket Entry No. 8-13, p.74). There is no ruling on these motions in the record.

    On the first morning of trial, the prosecutor represented to the court that she and Valles had reached an agreement concerning the extraneous offenses:

      [PROSECUTOR] MS. RUSSELL:  And Mr. Valles and I have discussed how to walk the line about extraneous allegations and I think what we agreed to do is we're just going to say or I'm going to say that officers started conducting surveillance of this defendant on this particular day based on information from a confidential source.

      THE COURT: Okay. That's fine. And like I said, if at some point you feel like the door has been opened, then we can have a hearing outside the presence of the jury.

      MR. VALLES: Okay. Thank you, Your Honor.

(Docket Entry No. 8-16, pp. 7-8).

During opening statements, the prosecutor told the jurors that they would hear about the drug

deal from Hernandez and Henriquez, both of whom would testify that they were acting "at the

bidding of" Arellano.  (Docket Entry No. 8-16, pp. 9-10).  In response, Valles argued:

> We're going to deal with a situation where, yes, officers did receive information, looked at my client, but when it comes down to it, you're going to find out there was an arrest, there was a bust.  My client was in the area and was present, but the drugs were never found on Mr. Arellano.  They were not in his car.  He was not in the car where the drugs were present.  Okay?
>
> This all goes to a very important element and concept we deal with in the law.  It's called links, possession.  The State is going to basically try to rest their connection, my client to the drugs by saying he was the boss, the one in control, calling the shots, managing the situation.  By saying managing, he was in possession.  Okay?  But the truth of the matter is, you have two other young individuals who are the ones in possession:  The one that grabbed the bag and the one driving the car where the dope was found.
>
> Now, these two gentlemen are going to take the stand.  They're going to get up and tell their story.  And I don't know if you remember when we discussed in voir dire, when someone takes the stand, they tell their story.  It's up to you to judge their testimony.  And you each gave different reasons, different things you look at to consider the truth-worthiness of their testimony:  Motive, their body language, why are they doing it.  Okay?  I want you to please keep all this in mind when you sit there and listen to the story, and by the end of testimony, at the end of this trial I believe you're going to have difficulty seeing where there is a direct connection of links and that my client is in possession of these drugs.  Thank you all so much.

(Docket Entry No. 8-16, pp. 11-12).  Valles's theory of defense was that Arellano was merely

present at the scene of a drug offense but had no connection to that offense.

During the testimony of Henriquez, Valles attempted to distance Arellano from Hernandez

and Henriquez.  In response to that line of questioning, the prosecutor argued that the door had been

opened for her to bring in evidence of the "extraneous acts" that she had noticed before trial.

21

> MS. RUSSELL: The line of questioning about why are you always driving Omar around, did he pay you to drive him around, do you have a full-time job; the structure of this deal is that the defendant calls the shots, Omar is the hands-on guy, and he is the driver. That's his role in life. And so based on that line of questioning, I believe the door has been opened.

(Docket Entry No. 8-16, p. 207). The trial court ruled that this line of questioning had opened the door as to Hernandez's activities, but not those of Arellano. (Docket Entry No. 8-16, p. 207). The prosecutor did not offer any evidence of extraneous acts at that point.

The next morning, before the jury returned, the trial court raised the issue of extraneous acts evidence again:

> THE COURT: Outside the presence of the jury, I wanted to take a matter up that was brought to my attention yesterday by the prosecution and the defense. The prosecution has requested that they be allowed to go into certain extraneous offenses involving the defendant, and after looking at the case law last night, I am in agreement with them, that those extraneous offenses are admissible.
>
> Number one, in order to rebut a defensive theory, the defense attorney during opening argument, you know, made an argument to the jury that there were no affirmative links, no possession and no direct connection between his client and this drug transaction, and the case law is clear, particularly in a drug case where there's possession with intent to deliver, that the State is entitled to put on evidence of extraneous offenses in order to prove up the element of intentional or knowing possession as well as the intent to deliver.
>
> So in the circumstances of this case, as I heard it yesterday from the witness stand, certain fact scenario, it is unclear what the defendant's involvement was and whether or not he intentionally or knowingly possessed or possessed with intent to deliver this cocaine, and so I am granting the State's request to put on evidence of prior -- my understanding is, and I would like a proffer from the State to make sure that I'm clear on what the other extraneouses are, but there was other similar extraneous offenses involving the defendant and two witnesses who have testified -- one who has testified and one who's going to testify -- that will make it clear that there were other similar drug transactions and also in a relatively short time frame.
>
> MS. RUSSELL: That's correct. In the handful of months prior to this case one of the codefendants, Omar, as well as Edgar,

traveled to various -- to a couple different cities in different states, transporting narcotics for the defendant. They had distinct roles. Edgar was the driver, as he was on the day of the charged offense. He would drive Omar to a city, they would have drugs with them, they would leave the defendant's residence, travel to the destination, get a hotel room.

Edgar's responsibility was to, for the most part, stay at the hotel room. Omar would leave during the day with various people to sell the narcotics in smaller amounts. He would return with cash. It would take roughly about a week for them to move all of the drugs that they brought with them that was provided by the defendant and then they would clean and package the money and then take the money back to the defendant's residence. When they arrived at the defendant's residence, Omar would get $1,000, Edgar would get $1,000 and they would go back home.

THE COURT: And so these drug transactions were being committed at the direction of the defendant?

MS. RUSSELL: At the direction and at the instruction of the defendant, and both of the codefendants, both Omar and Edgar, they were in communication with the defendant throughout the week the entire time, getting instructions, dealing with issues that came up during the week, and they would do what he told them to do regarding whatever issues popped up or just how the transactions were going throughout the week until they moved all of the drugs.

THE COURT: Mr. Valles?

MR. VALLES: **Of course I would object, but I understand the Court's ruling and respect the Court's ruling.** I do ask that we try to limit the time period, if possible, or the transactions, because there have been noted, I guess, scenarios and situations that kind of -- I think we've referenced going back even a couple years as regarding my client, but none of this -- not all of it includes the other two codefendants, so I would like to at least limit it to those involving the codefendants and they have intimate knowledge about.

MS. RUSSELL: Omar had been working for the defendant longer than Edgar. Omar starting working for the defendant approximately in January, selling marijuana. He does some transactions in January, so January 2015. February he took 15 pounds of weed to Louisiana.

THE COURT: I don't think that -- my ruling wouldn't include any transactions involving marijuana.

MS. RUSSELL: Okay. Let's see, yeah, we're getting into March and April when the transactions -- of course sometimes Omar's knowledge about what was going on increased over time. The defendant was always very good at limiting information from the

23

outset.  Oftentimes he would package narcotics in inconspicuous ways.  Sometimes they were wrapped like presents.  At some point the defendant came up with some sort of contraption that was a roll that looked like something construction workers would have.  He would often put tools in the back of the vehicle along with this roll, that then was wrapped up in paper to make it look like something innocuous.  Omar is going to have more knowledge of that, of when it becomes cocaine, because he's the one unpackaging it and selling it.

The marijuana, of course, being large quantities, sometimes he would -- like the ones that were wrapped like presents, he took them to a buyer and it wasn't until the buyer opened them that he realized what it was.  So in terms of the actual cocaine, that's going to be more starting in March, April, and that's when he's using the roll of, I think it's black roofing paper that's taped up.  So that's going to be March and April.  And of course all of that is going to be given to him by the defendant, vehicle, all that stuff provided by the defendant.   Gives him instructions about sometimes there's a backpack involved.

Edgar starts driving with him on a trip in April that they go to in Atlanta.  Edgar's role is the driver, as told to Omar by the defendant.  So I guess is that where Your Honor, you think we could start --

THE COURT:  Okay.

MS. RUSSELL: -- is that trip in April?

THE COURT:  If I understand what you're saying, that a drug transaction that occurred in March, Edgar was not part of that?  Is that what I'm understanding you to say?

MS. RUSSELL:  I don't think so.  I think Edgar gets involved in the Atlanta trip in April.

THE COURT:  Okay.  Then why don't we start there then, in April, where all these three are involved.

MS. RUSSELL:  Okay.

THE COURT:  And certainly in the charge to the jury, I'm having the charge bank add a limiting instruction on extraneous offenses, that they can consider it only for purposes of proving intent, knowledge, opportunity, motive, things like that.

MR. VALLES:  Okay.  Yes, ma'am.

(Docket Entry No. 8-17, pp. 5-10) (emphasis added).

The prosecutor then elicited testimony from Hernandez about various drug transactions that

he had engaged in at the direction of Arellano.  (Docket Entry No. 8-17, pp. 12-108).  After eliciting

testimony about several cocaine deals, the prosecutor sought to elicit testimony concerning a deal involving methamphetamine. (Docket Entry No. 8-17, pp. 107-08). Valles objected, noting that the trial court's ruling had limited the extraneous acts testimony to that involving cocaine. (Docket Entry No. 8-17, pp. 108-09). The trial court sustained the objection. (Docket Entry No. 8-17, pp. 108-09).

Later, the prosecutor elicited testimony from Hernandez regarding threats that Arellano allegedly made to another individual. (Docket Entry No. 8-17, pp. 175-76). The trial court intervened, ruling that such testimony violated the court's earlier ruling on extraneous acts. (Docket Entry No. 8-17, pp. 177-81). No further references were made to any extraneous acts. And the trial court later instructed the jury concerning the limitations on its use of the extraneous acts testimony. (Docket Entry No. 8-13, pp. 92).

In light of the arguments and testimony in the record, even if Arellano could show that Valles's performance fell below an objective standard of reasonableness because Valles "objected without specifying the objection to [the] extraneous offense acts" evidence, Arellano has not pointed to any evidence to establish that he was prejudiced by that alleged error. *See Strickland*, 466 U.S. at 687. The record does not show a reasonable probability that, but for this alleged error, the result of the proceeding would have been different. The trial court was clearly aware of the basis of Valles's objection to the extraneous acts evidence. The trial court analyzed the extraneous acts evidence under Rules 404(b) and 403 and determined that some, but not all, of the extraneous acts evidence was admissible. The court clearly limited the admissible evidence to that which was necessary to prove the disputed element of Arellano's intent and participation. The court also gave

25

a proper limiting instruction to the jury prior to deliberations, which the jurors are presumed to have followed. *See United States v. Nieto*, 721 F.3d 357, 371 (5th Cir. 2013).

Because the record does not show that Arellano was prejudiced by any alleged error made by Valles, this Court concludes that there was a reasonable basis for the state habeas court to deny relief. *See Richter*, 562 U.S. at 98. Because the denial of this claim was not an unreasonable application of *Strickland* to the facts before the court, Arellano is not entitled to federal habeas relief on this claim.

## VI.    The Lack of Corroboration Claim (Ground 5)

Arellano asserts that his conviction is invalid because there was insufficient corroboration of the testimony from the accomplice-witnesses, Hernandez and Henriquez. He asserts that because of this lack of corroboration, there is "nothing" to suggest that he possessed a controlled substance. Arellano raised this claim in the direct appeal of his conviction and sentence. (Docket Entry No. 8-6, pp. 14-22). The First Court of Appeals denied relief, concluding that the corroborating evidence was legally sufficient. *Arellano-Velazquez v. State*, No. 01-16-789-CR, 2018 WL 454796, at *2 (Tex. App.–Houston [1st Dist.] 2012, pet. ref'd) (mem. op., not designated for publication). Arellano mentioned this claim in his state habeas petition, (Docket Entry No. 8-21, p. 12), and he has raised it again in his federal habeas petition, (Docket Entry No. 1, p.7). Arellano has exhausted his state remedies on this claim, and this Court will address the merits of his claim.

"Under 28 U.S.C. § 2254, a federal court must entertain a claim by a state prisoner that he or she is being held in 'custody in violation of the Constitution or laws or treaties of the United States.'" *Jackson v. Virginia*, 443 U.S. 307, 320–21 (1979). "[A] state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have

26

led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." *Id.* at 321. However, the question before the federal court is narrow. The question is not whether the state court correctly applied its own interpretation of the state's substantive law or failed to enforce a purely state rule; rather, the question is whether the petitioner's federal constitutional rights were violated. *See Neyland v. Blackburn,* 785 F.2d 1283, 1293 (5th Cir. 1986). Thus, a petitioner is entitled to relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 324; *see also Norris v. Davis*, 826 F.3d 821, 833 (5th Cir. 2016).

In making this assessment, this court reviews the evidence, whether direct or circumstantial, in the light most favorable to the jury verdict. *See United States v. Resio-Trejo*, 45 F.3d 907, 910–11 (5th Cir. 1995); *United States v. Nguyen*, 28 F.3d 477, 480 (5th Cir.1994). "All credibility determinations and reasonable inferences are to be resolved in favor of the verdict." *Resio-Trejo*, 45 F.3d at 911. Further, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), a*ff'd on other grounds*, 462 U.S. 356 (1983). Finally, a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the "decision was 'objectively unreasonable.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (*quoting Cavazos v. Smith*, 565 U.S. 1, 2 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010).

In this case, the First Court of Appeals rejected Arellano's claim that the evidence against him was legally insufficient. In doing so, the First Court of Appeals found that the state presented sufficient evidence to corroborate the accomplice-witnesses' testimony:

In his first issue, Arellano argues that the evidence is insufficient to support his conviction because the accomplice-witness testimony presented by the State was not corroborated. The State responds that the accomplice-witness testimony was corroborated by the officers' testimony and the cell phones recovered from Arellano, Hernandez, and Henriquez.

Under the accomplice-witness rule, a defendant cannot be convicted on accomplice testimony unless the testimony is "corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CRIM. PROC. CODE art. 38.14.

In determining whether accomplice-witness testimony was sufficiently corroborated, we view the evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). "The corroborating evidence need not be sufficient by itself to establish guilt . . . ." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). Nor must it "directly link" the defendant to the offense. *Id.* (quoting *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997)). "There must simply be some non-accomplice evidence which tends to connect appellant to the commission of the offense alleged in the indictment." *Castillo*, 221 S.W.3d at 691.

Thus, "circumstances that are apparently insignificant may constitute sufficient evidence of corroboration." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). The Court of Criminal Appeals has explained that "proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Smith v. State*, 332 S.W.3d 425, 443 (Tex. Crim. App. 2011) (quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993)).

At trial, the State corroborated the accomplice-witness testimony with Officer Zamora's testimony. Zamora testified that he observed Arellano leave his residence in his Honda, pick up Hernandez, drive to a washateria, and park next to the Toyota driven by Henriquez. He then observed the Infiniti pull up and park next to the Honda and Hernandez exit the Honda, retrieve a backpack from the Infiniti's passenger, and place the backpack in the backseat of the

28

Toyota. Finally, he observed the Honda and Toyota drive "in tandem" to the convenience store, where the police stopped, detained, and searched Arellano, Hernandez, and Henriquez, finding six bricks of cocaine and multiple cell phones. Zamora testified that both the amount of cocaine and number of cell phones were consistent with narcotics trafficking.

The State further corroborated the accomplice-witness testimony with evidence retrieved from Hernandez's cell phone, which showed that Hernandez and Arellano called each other 36 times the day before the arrest. Zamora testified that the number of calls between Hernandez and Arellano was "very consistent with narcotics transactions" and indicated that there was "some sort of coordination or preparation going on right before the incident occurred." Hernandez's cell phone further showed that, on the day of the arrest, shortly before the exchange at the washateria, Hernandez texted Arellano, "Ya vamos" ("We are on our way"), and Arellano responded, "Okay." Zamora testified that these texts were sent around the same time he observed Arellano leave his house.

Thus, the corroborating evidence placed Arellano in the company of Hernandez and Henriquez at the scene of the narcotics exchange. *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) ("Evidence that the defendant was in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence."). It showed that the three of them had coordinated their movements and were working together. *See Silva v. State*, No. 01–10–00245–CR, 2012 WL 1564541, at *5 (Tex. App.–Houston [1st Dist.] May 3, 2012, pet. ref'd) (mem. op., not designated for publication) (holding that accomplice testimony was sufficiently corroborated in possession-with-intent-to-deliver case when officer observed that defendant and accomplice "appeared to act in tandem" as they arrived at used car lot, spoke on their cellphones and then with each other, had no contact with workers on site, left lot together, returned together, and pulled cover from car in which cocaine was found); *Herron v. State*, No. 01–04–00640–CR, 2005 WL 1646043, at *4–5 (Tex. App.–Houston [1st Dist.] July 14, 2005, pet. ref'd) (mem. op., not designated for publication) (holding that accomplice testimony was sufficiently corroborated in possession-with-intent-to-deliver case when officer observed defendant follow accomplice vehicle and remain close at hand during drug transaction). We hold that the State presented evidence that sufficiently corroborated the accomplice-witness testimony. Therefore, we overrule Arellano's first issue.

29

*Arellano-Velazquez v. State*, No. 01-16-789-CR, 2018 WL 454796, at *2 (Tex. App.–Houston [1st

Dist.] Jan. 18, 2018, pet. ref'd) (not designated for publication).

The First Court of Appeals concluded that the evidence that Arellano had numerous

communications with Hernandez in the days leading up to the transaction, that he and Hernandez

and Henriquez coordinated their movements on the day of the transaction, and that Arellano was

present at the scene of the transaction itself constituted sufficient corroboration of the accomplice-

witnesses' testimony. In light of this evidence, this Court does not find that the First Court of

Appeals' decision was objectively unreasonable. Further, this Court cannot say that no rational trier

of fact could have found the evidence sufficient to find Arellano guilty beyond a reasonable doubt.

Therefore, Arellano is not entitled to federal habeas relief on this claim.

## VII.    The State Habeas Court Error Claims (Grounds 1(a), (b), (c), and (d))

The primary arguments running through Arellano's federal habeas petition are that the state

habeas court denied him due process by "refus[ing] to answer" and/or denying his motion seeking

a 90-day "loan" of his trial transcripts (ground 1(a)); that the First Court of Appeals denied him due

process and equal protection by denying his petition for mandamus that sought to compel the trial

court to grant his motion for a "loan" of his trial transcripts (ground 1(b)); that the state habeas court

denied him due process by failing to obtain an affidavit from Valles relating to the Ineffective

assistance of counsel claims (ground 1(c)); and that the state habeas court denied him due process

by failing to make findings of fact and conclusions of law concerning the claims he raised (ground

1(d)).

"[I]nfirmities in the state habeas proceedings do not constitute grounds for habeas relief in

federal court." *Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir. 1999) (quoting *Hallmark v. Johnson,*

30

118 F.3d 1073, 1080 (5th Cir. 1997)); *see also Morris v. Cain,* 186 F.3d 581, 585 n.6 (5th Cir. 1999); *Nichols v. Scott,* 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'") (quoting *Millard v. Lynaugh,* 810 F.2d 1403, 1410 (5th Cir. 1987)).  Arellano has not alleged an error in the state habeas court proceeding that affects the deference due the state habeas court's findings–whether actual or implicit–in the state habeas proceedings.  Arellano has therefore not shown a basis for granting federal habeas relief.

To the extent that Arellano alleges that his federal constitutional rights to due process and equal protection were violated by the refusal of the trial court and the First Court of Appeals to "loan" him his trial transcript, he has not stated a cognizable claim.  The Constitution does not require the state to provide a habeas petitioner with a free copy of his trial transcript for the purpose of searching for possible errors "merely because he is indigent." *Bonner v. Henderson,* 517 F.2d 135, 135 (5th Cir. 1975); *see also Deem v. Devasto,* 140 F. App'x 574, 575 (5th Cir. 2005) (holding that "there is no constitutional mandate that a habeas petitioner must be provided a free copy of his state-court criminal trial record" in connection with his state or federal habeas proceeding); *United States v. Herrera,* 474 F.2d 1049, 1049-50 (5th Cir. 1973) ("This Court has consistently held that a federal prisoner is not entitled to obtain copies of court records at the government's expense to search for possible defects merely because he is an indigent.").  An indigent petitioner is entitled to a free copy of the trial transcript only if he can establish that it is necessary for a fair adjudication of at least one of his claims. *See Smith v. Beto,* 472 F.2d 164, 165 (5th Cir. 1972).  Arellano has not

specified—much less proved—which, if any, of his claims he is unable to properly litigate because he has been deprived of a copy of the trial transcript.

Further, when appellate counsel has been provided with a copy of the transcript, "there is no requirement that the defendant be provided with physical custody of a copy of his transcript." *Id.* (quoting *United States v. Fay,* 230 F. Supp. 942, 948 (S.D.N.Y.1964)); *see also Ballard v. Collins,* No. 93–1151, 1994 WL 121936, at *1 (5th Cir. Mar. 23, 1994) ("Because Ballard had access to the trial record in his direct appeal, there is no constitutional requirement that he obtain physical custody of the record in this federal habeas-corpus action." (citing *Smith,* 472 F.2d at 165)); *Richardson v. Quarterman,* No. CIV.A. H-08-1612, 2008 WL 5056724, at *5–6 (S.D. Tex. Nov. 20, 2008). Arellano's appellate attorney apparently had a copy of the trial transcript for his direct appeal because she cited to it throughout Arrellano's appellate brief to the First Court of Appeals. *See Ballard,* No. 93–1151, 1994 WL 121936 at *1 (concluding that the petitioner's appellate attorney had access to the trial transcript on direct appeal because the appellate brief "contains references to the trial record"). Arellano was not entitled to another copy.

Arellano has not shown that the state habeas court's denial of relief on this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). The AEDPA standard is satisfied only when there is no possibility that a fair-minded jurist could disagree that the state court's decision conflicts with Supreme Court precedent. *See Richter,* 562 U.S. at 102. Arellano has not met this burden, and the relitigation bar of section 2254(d) forecloses the relief he seeks in this federal habeas proceeding. Accordingly, this Court denies relief on this claim.

**VIII.   Conclusion**

The respondent's Motion for Summary Judgment, (Docket Entry No. 7), is GRANTED. Arellano's petition for a writ of habeas corpus is DENIED.  This case is DISMISSED.  Any remaining pending motions are DENIED as moot.

The Supreme Court has stated that the showing necessary for a Certificate of Appealability is a substantial showing of the denial of a constitutional right.  *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000); *see also Hernandez v. Johnson,* 213 F.3d 243, 248 (5th Cir. 2000).  Under that standard, a petitioner makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further.  *See Clark v. Johnson,* 202 F.3d 760, 763 (5th Cir. 2000).  When a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack,* 529 U.S. at 484.

This Court denies Arellano's petition after careful consideration of the merits of his constitutional claims.  This Court denies a COA because Arellano has not made the necessary showing for issuance.  Accordingly, a certificate of appealability is DENIED.

SIGNED at Houston, Texas, on M 2 R ( M | 2, 2021.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE